UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | **CRIMINAL COMPLAINT** |
| v. | : | Mag. No. 07-3136 (PS) |
| AKOUAVI KPADE AFOLABI, a/k/a "Gloria Lawson," a/k/a "Sister," a/k/a "Selina," LASSISSI AFOLABI, a/k/a "Fovi," a/k/a "Bogard," and DERECK HOUNAKEY, a/k/a "Koko" | : | SEP 0 4 2007 |

I, Ronald C. Conyers, being duly sworn, state the following is true and correct to the best of my knowledge and belief. From in or about October 2002 through on or about September 4, 2007, in Essex County, in the District of New Jersey, and elsewhere, defendant AKOUAVI KPADE AFOLABI, a/k/a "Gloria Lawson," a/k/a "Sister," a/k/a "Selina," LASSISSI AFOLABI, a/k/a "Fovi," a/k/a "Bogard," and DERECK HOUNAKEY, a/k/a "Koko," did:

SEE ATTACHMENT A

In violation of Title 8, United States Code, Sections 1324(a)(2)(B)(ii), 1324(a)(1)(A)(iii), and 1324(a)(1)(A)(v)(I).

I further state that I am a Special Agent of U.S. Immigration & Customs Enforcement, and that this complaint is based on the following facts:

SEE ATTACHMENT B

Continued on the attached pages and made a part hereof.

Ronald C. Conyers, Special Agent
Department of Homeland Security,
U.S. Immigration & Customs Enforcement

Sworn to before me and subscribed in my presence,
September 4, 2007, at Newark, New Jersey

HON. PATTY SHWARTZ
U. S. MAGISTRATE JUDGE                  Signature of Judicial Officer

## ATTACHMENT A

### Count One

In or about October 2002, in Essex County, in the District of New Jersey, and elsewhere, defendant

**AKOUAVI KPADE AFOLABI,**
a/k/a "Gloria Lawson," a/k/a "Sister," a/k/a "Selina,"

did knowingly and in reckless disregard of the fact that an alien had not received prior official authorization to come to, enter, and reside in the United States, bring to and attempt to bring to the United States such alien, regardless of the official action which may later be taken with respect to such alien, for the purpose of commercial advantage and private financial gain, in violation of Title 8, United States Code, Section 1324(a)(2)(B)(ii).

### Count Two

From in or about October 2002 through in or about September 4, 2007, in Essex County, in the District of New Jersey, and elsewhere, defendants

**AKOUAVI KPADE AFOLABI,**
a/k/a "Gloria Lawson," a/k/a "Sister," a/k/a "Selina,"
**LASSISSI AFOLABI,**
a/k/a "Fovi," a/k/a "Bogard,"
and
**DERECK HOUNAKEY,**
a/k/a "Koko,"

did knowingly and in reckless disregard of the fact that an alien had come to, entered, and remained in the United States in violation of law, conspire and agree with others to conceal, harbor, and shield from detection such alien in any place, including any building or any means of transportation, for the purpose of commercial advantage and private financial gain, contrary to Title 8, United States Code, Section 1324(a)(1)(A)(iii), in violation of Title 8, United States Code, Section 1324(a)(1)(A)(v)(I).

## ATTACHMENT B

I, Ronald C. Conyers, a Special Agent with the Department of Homeland Security, United States Immigration and Customs Enforcement (hereinafter "ICE"), having conducted an investigation and having spoken with other individuals, have knowledge of the following facts:

1. Since at least as early as June 2007, ICE agents in Newark have been conducting an investigation into alien smuggling, alien harboring, and forced labor activities in East Orange, New Jersey and elsewhere. During that time, agents have determined that a substantial number of West African females have been brought into the United States through the use of fraudulent documentation to work without pay at hair braiding salons located in New Jersey.

2. Each year, the Department of State designates a certain number of visas under a variety of programs, one of which is the Diversity Visa Program. Under the Diversity Visa Program, a person is permitted to enter and reside in the United States as a lawful permanent resident. A visa issued pursuant to the Diversity Visa Program is called a "diversity visa" or a "DV." Diversity visas are issued, by lottery, to citizens of countries that the Department of State has determined are under represented in the annual immigrant process. The winner of a diversity visa is the primary beneficiary and is designated as a DV-1 class visa. Any immediate relative spouse of a DV-1 is considered the secondary beneficiary and is designated as a DV-2 class visa. Any child of a DV-1 is considered the tertiary beneficiary and is designated as a DV-3 class visa.

3. In or about June 2007, a confidential witness ("CW-1") informed ICE agents, in substance and in part, that when she was approximately 15 years old, her father arranged for her to travel from her home in Ghana to the United States with defendant AKOUAVI KPADE AFOLABI, a/k/a "Gloria Lawson," a/k/a "Sister," a/k/a "Selina" ("KPADE AFOLABI"), with the understanding that CW-1 would attend school in the United States. Sometime in 2002, CW-1 was taken to live in defendant KPADE AFOLABI's house in Togo, where she resided for several months before entering the United States with four additional girls, none of whom were related to defendant KPADE AFOLABI. During the time that CW-1 lived with defendant KPADE AFOLABI in Togo, defendant KPADE AFOLABI introduced CW-1 to a man who had been awarded a DV-1 visa and told CW-1 that she was to falsely refer to this man as her stepfather. Subsequently, CW-1 received a Togolese passport with a false name and was taken to the U.S. Embassy in Lome, Togo, with her purported stepfather, for an interview. Per the instructions of defendant KPADE AFOLABI, CW-1 falsely claimed to the officials that this man was her stepfather so that she would qualify for a DV-3 visa. After the interview at the U.S. Embassy, CW-1 never saw her purported stepfather again.

4. CW-1 advised that she entered the United States from Togo in or about October 2002, with the Togolese passport and immigration documents in the false name which defendant KPADE AFOLABI provided. CW-1 traveled by plane to John F. Kennedy International Airport with defendant KPADE AFOLABI, the four other girls

from defendant KPADE AFOLABI's house in Togo, an older man, and a young boy. After the group was admitted into the United States, CW-1, the four other girls, and defendant KPADE AFOLABI, were picked up by defendant KPADE AFOLABI's husband, defendant LASSISSI AFOLABI, a/k/a "Fovi," a/k/a "Bogard" ("LASSISSI AFOLABI"), and taken to live at an apartment located in Newark, New Jersey. After leaving the airport, CW-1 never saw the older man again.

5. Once in the United States, defendant KPADE AFOLABI informed CW-1 that CW-1 would have to work for defendant KPADE AFOLABI at salons braiding hair. From in or about November 2002, through the middle of 2006, CW-1 worked at various hair braiding salons six or seven days every week, beginning at approximately 9:00 a.m. each day, for a period of from eight to fourteen hours per day depending on how busy the particular salon was that day. During this entire time, CW-1 had to turn over all the money that she earned working at these salons, including tips, to defendants KPADE AFOLABI and LASSISSI AFOLABI. CW-1 also related that the other girls who lived at the residence of defendants KPADE AFOLABI and LASSISSI AFOLABI in New Jersey, similarly were forced to work in hair braiding salons without being allowed to keep any of their earnings. According to CW-1, none of the girls were permitted to leave the residence, except to go to work. Although the girls would sometimes walk or take a bus to work, oftentimes, defendant LASSISSI AFOLABI and defendant KPADE AFOLABI's son, defendant DERECK HOUNAKEY, a/k/a "Koko" ("HOUNAKEY"), would drive the girls to work at various hair braiding salons located in Essex County, New Jersey, and pick them up in the evenings after work.

6. CW-1 also told ICE agents that defendant LASSISSI AFOLABI would beat the girls if a girl did not return to the residence immediately after work, if she asked for money, or if she disobeyed defendant KPADE AFOLABI or defendant LASSISSI AFOLABI. Defendant KPADE AFOLABI condoned the beatings, according to CW-1, and would also strike the girls and threaten to return them to Africa if they did not obey her commands or those of her husband.

7. From surveillance conducted from in or around June 2007 through on or about August 30, 2007, ICE agents have determined that a number of young females reside with defendants KPADE AFOLABI and LASSISSI AFOLABI at 169 Clinton Street, East Orange, New Jersey. According to CW-1, she last resided with defendants KPADE AFOLABI and LASSISSI AFOLABI at 169 South Clinton Street. Further, CW-1 has identified two of the females observed at 169 South Clinton Street as ones with whom CW-1 entered the United States in October 2002, with what are believed to be fraudulently obtained visas.

8. Agents have further determined through surveillance that the females residing at 169 South Clinton Street work at hair braiding salons located in East Orange, New Jersey, including Ashley's Hair Braiding Salon, which record checks reveal is owned by defendant LASSISSI AFOLABI.

9.  Similarly, ICE agents have determined that a number of young females reside with defendant HOUNAKEY at 71 North 18th Street, First Floor, East Orange, New Jersey, and that defendant HOUNAKEY transports these females in a green minivan from this residence to work at a number of hair braiding salons, including Newark Hair Braiding, which record checks reveal is owned by defendant HOUNAKEY. CW-1 has identified one of the females observed at 71 North 18th Street, First Floor, as R.M., with whom CW-1 entered the United States in October 2002.

10. During an interview with ICE agents on or about August 9, 2007, a second confidential witness ("CW-2") stated, in substance and in part, that he applied for and won a DV-1 visa in 2001, with the names of his son and daughter listed as beneficiaries. After CW-2 realized that he could not afford the application fees or the airplane tickets, a cousin of CW-2 introduced CW-2 to defendant KPADE AFOLABI, whom he knew only as "Sister." Sometime during 2002, defendant KPADE AFOLABI assured CW-2 that she could help him with the applications and the interview process.

11. Subsequently, per defendant KPADE AFOLABI's instructions, CW-2 provided defendant KPADE AFOLABI with copies of his children's birth certificates. When defendant KPADE AFOLABI contacted CW-2 about his interview at the U.S. Embassy, defendant KPADE AFOLABI told CW-2 not to bring his children. Instead, when CW-2 arrived at defendant KPADE AFOLABI's house on the day of the interview, defendant KPADE AFOLABI introduced CW-2 to R.M. and a young boy and informed CW-2 that he was to go to the interview with the United States Embassy and falsely claim these children as his own. When CW-2 expressed his anger about not being able to take his own children with him to the United States, defendant KPADE AFOLABI told him that if he did not like the arrangements, he would not go to the United States at all. CW-2 felt that he had no choice but to follow defendant KPADE AFOLABI's instructions, and reluctantly decided to do as KPADE AFOLABI demanded.

12. In or about October 2002, CW-2 traveled with defendant KPADE AFOLABI and a number of children, including R.M., from Togo to the United States. In accordance with defendant KPADE AFOLABI's instructions, CW-2 presented R.M. as his daughter to the immigration authorities upon their arrival at John F. Kennedy International Airport. After everyone in the group had been admitted into the United States, defendant KPADE AFOLABI left with the children in a separate vehicle. CW-2 stated that he never saw any of the children again.